IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION


- - - - - - - - - - - - - X
UNITED STATES OF AMERICA, :
                         :
      Plaintiff,         :
                         :
vs.                      :          Case No. 4:14-mj-00195
                         :
WILLIAM THEODORE NICELY, :          HEARING TRANSCRIPT
                         :
      Defendant.         :
- - - - - - - - - - - - - X


                         Courtroom, Fourth Floor
                         U.S. Courthouse
                         123 East Walnut Street
                         Des Moines, Iowa
                         Wednesday, August 20, 2014
                         11:06 a.m.


BEFORE:  THE HONORABLE CELESTE F. BREMER, Magistrate Judge.


APPEARANCES:

For the Plaintiff:       CRAIG P. GAUMER, ESQ.
                         Assistant U.S. Attorney
                         U.S. Courthouse Annex
                         110 East Court Avenue, Room 286
                         Des Moines, Iowa  50309-2053

For the Defendant:       B. JOHN BURNS, III, ESQ.
                         Assistant Federal Public Defender
                         Capital Square, Suite 340
                         400 Locust Street
                         Des Moines, Iowa  50309



                  KELLI M. MULCAHY, CSR, RMR, CRR
                     United States Courthouse
                 123 East Walnut Street, Room 115
                      Des Moines, Iowa 50309

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| For the Government: | | | | |
| Thomas Reinwart | 3 | 16 | 18 | 19 |

1          P R O C E E D I N G S

2              (In open court.)

3              THE COURT:  Please be seated.

4              This is Case 4:14-mj-195, and it's United States vs.

5    William Nicely.  Mr. Nicely appears with counsel.  He had his

6    initial appearance on the complaint and this is the time set for

7    the preliminary hearing and detention hearing.

8              I have received and reviewed the Pretrial Services

9    Report.  We didn't have it completely done last time.

10             Is it still the Government's motion that he be

11   detained?

12             MR. GAUMER:  Yes, Your Honor.

13             THE COURT:  Does Defendant still request a preliminary

14   hearing?

15             MR. BURNS:  Yes, Your Honor.

16             THE COURT:  All right.  We'll go ahead and do both,

17   then.

18             So does the Government have any testimony?

19             MR. GAUMER:  Yes, Your Honor.  The United States calls

20   Special Agent Reinwart.

21             THOMAS J. REINWART, GOVERNMENT'S WITNESS, SWORN

22                        DIRECT EXAMINATION

23   BY MR. GAUMER:

24   Q.  Special Agent Reinwart, can you hear me okay?

25   A.  Yes.

1  Q.  All right.  Would you again state your name for the record

2  and spell it?

3  A.  Thomas J. Reinwart, R-e-i-n-w-a-r-t.

4  Q.  What's your occupation?

5  A.  Special agent with the Federal Bureau of Investigation.

6  Q.  Let's go back a little bit earlier than that.  What's your

7  educational background?

8  A.  I have a major in business administration, computer studies

9  from Webster University in St. Louis, Missouri.

10 Q.  And what did you do after you graduated from college?

11 A.  Eventually I worked as a police officer in a small

12 municipality in St. Louis County for approximately seven years.

13 Q.  And then what did you do?

14 A.  Joined the FBI.

15 Q.  How long have you been an FBI agent, then?

16 A.  Almost 15 years.

17 Q.  What's your current duty station?

18 A.  Cedar Rapids resident agency of the Omaha field office.

19 Q.  What is it you do there?

20 A.  Generally now I work violent crime-type matters.

21 Q.  And are you the case agent for the FBI in any event who has

22 been investigating the matter that brings us here today against

23 Mr. Nicely?

24 A.  Yes.

25 Q.  When did that first -- when and how did that first come to

1  your attention?

2  A.  It was late in 2013.  Information was provided us from the

3  Iowa DCI, Department of Criminal Investigation, asking our help

4  on an investigation they were conducting in Batavia, Iowa.

5  Q.  And what was the nature of that investigation?

6  A.  It was a sexual relationship between a

7  half-brother/half-sister and a possible kidnapping.

8  Q.  Who is the person who committed the, as far as you know

9  investigation-wise, alleged kidnapping?

10  A.  He was identified as William Nicely.

11  Q.  That would be the defendant in this case?

12  A.  Correct.

13  Q.  And who was the person who was allegedly kidnapped?

14  A.  Jessica Kahl.

15  Q.  And what is his relationship with her?

16  A.  They are half-siblings.

17  Q.  Now, you mentioned something about there was a sexual

18  relationship?

19  A.  Correct.

20  Q.  What was reported to you, either you or other law

21  enforcement people, about the sexual relationship between the

22  two of them?

23  A.  From the father, he had identified or determined that the

24  defendant and Jessica Kahl were involved in a sexual

25  relationship.

1  Q.  And when you say father, is that their joint father?

2  A.  Correct.

3  Q.  That would be William Kahl?

4  A.  Correct.

5  Q.  And when you say sexual relationship, I mean, let's explain

6  that in somewhat detail.  What exactly are you talking about?

7  A.  That they had had at least intercourse together.

8  Q.  All right.  Now, how did Mr. Kahl know this?

9  A.  He confronted his son, the defendant, about this.

10  Q.  And when, approximately, did he confront his son about this?

11  A.  Mid- to late October 2013.

12  Q.  And what was the result of the confrontation or the meeting

13  between the two of them?

14  A.  Initially from what Mr. Kahl reported was that the defendant

15  denied the allegations but then ultimately did admit to his

16  sexual relationship with Ms. Kahl.

17  Q.  Now, at that time were the defendant and his sister living

18  together?

19  A.  I'm not sure if they were or not.  Initially they were when

20  they moved to Iowa.  At this specific time, the defendant may

21  have had his own residence.

22  Q.  All right.  And they moved here from where, from what state?

23  A.  Pennsylvania.

24  Q.  All right.  And as a result of, then, Mr. Kahl, the father,

25  learning what his son and daughter were doing together, what

1    happened or what did he ask his son to do?

2    A.   He confronted the son about it and told his son that he

3    should leave the area and go back to Pennsylvania.

4    Q.   And as far as Mr. Kahl knew, is that what happened?

5    A.   Yes.

6    Q.   All right.  Was there anyone else to whom the defendant

7    confessed that he was involved in that type of relationship?

8    A.   Yes.  To his aunt, who would have been Mr. Kahl's sister,

9    Hazel Kahl.

10   Q.   After the defendant moved back to Pennsylvania, what has

11   your investigation shown about communications he had with his

12   sister?

13   A.   They were communicating at least, from what we know, through

14   Facebook messages.

15   Q.   Now, at some point Mr. Kahl was interviewed by law

16   enforcement; is that correct?

17   A.   Correct.

18   Q.   And when he was interviewed by law enforcement, what did he

19   have to say about communications he had with his sister?

20   A.   Mr. Nicely was interviewed.

21   Q.   Did I say Mr. Kahl?  Mr. Nicely.  Thank you.

22   A.   That he had with?

23   Q.   His sister when he was in Pennsylvania.

24   A.   That he had been in contact with her via telephone, text,

25   and through photographs.

1 Q.  All right.  As part of the investigation did the FBI obtain

2 the Facebook communications between the defendant and his

3 sister?

4 A.  Yes.

5 Q.  And did you personally review those?

6 A.  Yes.

7 Q.  And when approximately -- let's go back a moment.  When did

8 Mr. Kahl -- excuse me -- when did Mr. Nicely leave Iowa and go

9 back to Pennsylvania, approximately?

10 A.  The last week of October, approximately October 28th, 2013.

11 Q.  And what time frame of communications did you review?

12 A.  I believe they were approximately October 29th through

13 November 8th.

14 Q.  With whom was Mr. Nicely communicating, at least as it

15 relates to this investigation?

16 A.  Between himself and Jessica Kahl.

17 Q.  So between their two Facebook accounts; is that correct?

18 A.  Correct.

19 Q.  And was it the private messaging part of Facebook, they were

20 sending messages?

21 A.  I believe that's where the communication was taking place.

22 Q.  Can you tell us what type of things, generally speaking,

23 they were talking to one another about between, let's say, late

24 October and early November?

25 A.  They were talking about their love, professing their love

1  for one another; their prior sexual involvement; and how they'd

2  like to continue the relationship into the future.

3  Q.  The parts of the affidavit in support of the complaint in

4  paragraph 6 that recite communications between Mr. Nicely and

5  J.D., are those some of the communications that you have

6  reviewed between the two of them?

7  A.  Correct.

8  Q.  What did Mr. Nicely say about plans that he had with her or

9  what he wanted to do with her?

10  A.  One of the places they talked about maybe going was to Ohio,

11  where they thought maybe it was legal for them to eventually get

12  married.  Also noted in other messages possibly New Jersey.

13  Q.  Was there any foreign country they talked about going to?

14  A.  He referenced having things set up in Canada.

15  Q.  As part of those messages was it clear that they intended to

16  continue having a sexual relationship with one another?

17  A.  Yes.

18  Q.  Was there any discussion about the possibility of him having

19  impregnated his sister?

20  A.  Yes, there was.

21  Q.  And what was that discussion, just generally?

22  A.  Basically, I believe he said to the effect that there may be

23  a seed, his seed, in her belly.

24  Q.  And was he distressed by that?

25  A.  Pardon?

1  Q.  Was he distressed by that, according to the chats?

2  A.  It did not appear like that to me.

3  Q.  At some point were there any chats related to him showing up

4  and meeting her at her house back in Iowa?

5  A.  Yes.

6  Q.  And what was that?

7  A.  I believe it was the last message that was posted on the

8  account on or about November 8th to the effect saying, "I'm

9  here.  Look out the window."

10  Q.  And as far as Mr. Kahl, then, is concerned, their father,

11  what did he report as to when his daughter ended up missing?

12  A.  Approximately 3 a.m., I believe, on the morning of November

13  9th.

14  Q.  What did he discover?

15  A.  He thought he heard a sound.  He woke up and he went to

16  Jessica's room to look for her, found her gone.  Looked outside

17  and said he saw like a sheet or a blanket down the gutter area

18  and when he went downstairs -- she was not in her room.  When he

19  went downstairs, outside he saw eventually like a backpack or a

20  duffel bag outside with some religious materials and I believe

21  some clothing in it.

22  Q.  Was there a note?

23  A.  Yes, there was.

24  Q.  And what, generally, did the note have to say?

25  A.  From what Mr. Kahl said, it appeared to have been written by

1  Jessica and basically apologized for what she did and that she

2  would come back one day.

3  Q.  Did he give any permission for his -- how old is Jessica?

4  A.  Fifteen.

5  Q.  Did he give Jessica permission to leave?

6  A.  No.

7  Q.  Did he give his son permission to take Jessica?

8  A.  No.

9  Q.  Did he have any idea where they were going?

10  A.  No.

11  Q.  And he's the custodial parent of Jessica; is that correct?

12  A.  My understanding, correct.

13  Q.  Then what did he do when he learned that his daughter had

14  left in this manner?

15  A.  He contacted law enforcement.  He also had contacted some

16  other family back in Pennsylvania.

17  Q.  Okay.  And was a warrant issued for Mr. Nicely's arrest?

18  A.  Yes.  By the Jefferson County Sheriff's Office.

19  Q.  That would have been in approximately November of last year?

20  A.  I believe so, yes.

21  Q.  All right.  Now, how long were Mr. Nicely and his sister,

22  I'll use the term, on the run?  But how long were they not

23  caught by law enforcement or were they out of anywhere where

24  their family knew where they were?

25  A.  Well, they left Iowa -- the date that Jessica Kahl left Iowa

1 was on or about November 9th, 2013, and they weren't found until

2 approximately March 27th, 2014, in Tennessee.

3 Q.  And was that Roane County, Tennessee?

4 A.  Correct.

5 Q.  Where were they actually found and how were they found?

6 A.  One of the sheriff's deputies for Roane County received some

7 information, I believe from a store, like a convenience store

8 clerk, about a suspicious individual.  Their investigation led

9 them to Mr. Nicely.  They were found at a residence which was

10 the residence of a friend, the father of a friend of Mr. Nicely.

11 Q.  And what is the friend's name of Mr. Nicely?

12 A.  Dennis Prosser.

13 Q.  Has he been interviewed in connection with this matter?

14 A.  Yes.

15 Q.  And what does Mr. Prosser know about all this?

16 A.  He knows that Mr. Nicely traveled from Pennsylvania to Iowa

17 to pick up Jessica and that they ultimately traveled to

18 Tennessee, where Mr. Prosser introduced Mr. Nicely and Jessica

19 to his father and was living there.

20 Q.  And how does he know that Mr. Nicely is the person who went

21 from Pennsylvania to Iowa to get Jessica?

22 A.  Mr. Prosser was with him.

23 Q.  All right.  Was Mr. Nicely arrested when he was encountered

24 by law enforcement authorities in March of 2014?

25 A.  Yes.

1  Q.  Was he Mirandized?

2  A.  Yes.

3  Q.  And was he questioned?

4  A.  Yes.

5  Q.  Did he admit to having a sexual relationship with his

6  sister?

7  A.  Yes.

8  Q.  Did he admit that sexual relationship happened both before

9  he took her and after he took her?

10  A.  Yes.

11  Q.  What did he have to say about himself taking any images of

12  her, either naked or of her having sex?

13  A.  He admitted to having -- that they exchanged nude

14  photographs of one another.

15  Q.  Did he make admissions that he is, in fact, the person who

16  took his sister from Iowa to Tennessee?

17  A.  Yes.

18  Q.  Has Jessica been interviewed?

19  A.  Yes.

20  Q.  And have you reviewed the results or the reports of that

21  interview?

22  A.  Yes.

23  Q.  What did she have to say about whether or not she was

24  involved with a sexual relationship with her brother?

25  A.  She admitted to being involved in one in Iowa and then also

1  in Tennessee.

2  Q.  And did she actually state that -- admit that, I guess, they

3  produced a videotape of themselves engaging in the act of sexual

4  intercourse while they were in Tennessee?

5  A.  Yes.

6  Q.  And he used his laptop computer to do that?

7  A.  That's what she had said.

8  Q.  What do you know about this laptop computer?

9  A.  Currently it's in the possession, I believe, of the FBI in

10  our Knoxville office.

11  Q.  Has not been examined yet, as far as we know?

12  A.  Correct.

13  Q.  Do you know where it was purchased?

14  A.  In Iowa, I'm not sure if it was Ottumwa or Fairfield, at a

15  Walmart store.

16  Q.  And, again, that was located where at the time of his arrest

17  or shortly thereafter?

18  A.  Within the residence where they were staying.

19  Q.  All right.  So the family members of the defendant and his

20  sister, the ones that the investigative team have talked to, all

21  made it abundantly clear when they learned about their

22  relationship that it was inappropriate and conveyed that to

23  them; is that correct?

24  A.  Yes.

25  Q.  And as a result of that, rather than stopping the behavior,

1  the end result of that was him coming to get her and taking her

2  to Tennessee?

3  A.  Correct.

4  Q.  Have you done any investigation into Mr. Nicely's status

5  with the National Guard?

6  A.  Yes.

7  Q.  And what investigation have you done?

8  A.  I contacted -- the DCI initially contacted the National

9  Guard at my request to obtain what his current status is with

10 the National Guard, and then I did some follow-up communications

11 with one of the lieutenant colonels today.

12 Q.  The bond report says the defendant advised the probation

13 office that he had been in the Army National Guard since

14 November 2006 and is still active.  Is that consistent with the

15 information that you obtained directly from the Army?

16 A.  No, it is not.

17 Q.  What did the Army say?

18 A.  As of, I believe it was, March 26, 2014, he was discharged

19 for continuous and willful absence from regular training duties.

20 Q.  Is there any other information you're aware of concerning

21 the offense charged in the complaint that we have not discussed?

22 A.  Not that I'm aware of.

23 Q.  All right.  If the defendant were released, what conditions

24 are you aware of that would keep he and his sister apart?

25 A.  I don't know of any off the top of my head.

1    MR. GAUMER:  I have no further questions, Your Honor.

2    THE COURT:  And where is his sister residing now?

3    THE WITNESS:  She's living with her father still in

4  Batavia, Iowa.

5    THE COURT:  Thank you.

6    All right.  Questions?

7                      CROSS-EXAMINATION

8  BY MR. BURNS:

9  Q.  Special Agent Reinwart, what small municipality in St. Louis

10  County were you a police officer with before you came on with

11  the FBI?

12  A.  Town and Country.

13  Q.  Where is that?

14  A.  It's in west St. Louis County.

15  Q.  Are you pursuing this case as a kidnapping?

16  A.  It was one of the initial investigative avenues we were

17  looking at.

18  Q.  Are you still pursuing it as a kidnapping?

19  A.  Again, it's one of the charges we're looking at.

20  Q.  Now, your theory essentially was that he and Jessica went to

21  another state to engage in illegal sexual behavior, correct?

22  A.  Yes.

23  Q.  And essentially, assuming, for the sake of argument, that

24  everything is true that you've been told, essentially, the

25  activity that he engaged in with his half-sister is illegal in

1  more than one way, correct?

2  A.  More than one way?

3  Q.  Well, it's illegal because of the age difference, number

4  one, correct?

5  A.  Oh, okay.

6  Q.  Is that right?

7  A.  Correct.

8  Q.  And it's illegal because allegedly they're related by

9  affinity or consanguinity?

10 A.  That's my understanding.

11 Q.  And that would be true both whether or not Jessica gave

12 consent, correct?

13 A.  That offense?

14 Q.  Yes.

15 A.  Correct.

16 Q.  Either one of those offenses, correct?

17 A.  Correct, to my understanding.

18 Q.  Whether there's a mutual relationship between them, it would

19 still be illegal activity, right?

20 A.  To my understanding.

21 Q.  Is it fair to say that based on interviews with Jessica and

22 what you've seen in the communications that went back and forth

23 between the defendant and Jessica that it was actually a mutual

24 relationship between the two of them?

25 A.  Correct.

1  Q.  And there's no indication at all that Mr. Nicely has ever

2  been engaged in any type of inappropriate behavior with anybody

3  but Jessica, correct?

4  A.  To my knowledge.

5  Q.  No indication that he's engaged in any kind of pattern of

6  activity involving anything but Jessica Kahl, correct?

7  A.  Correct.

8  Q.  Now, you also indicated that he was discharged from the Iowa

9  National -- was it the Iowa National Guard or the Pennsylvania

10  National Guard?

11  A.  Iowa.

12  Q.  And you said March 24th?

13  A.  I believe it was March 26th.

14  Q.  March 26th.  Right about the time of his arrest, correct?

15  A.  I believe just prior.

16  Q.  Is there any indication or any information that you've been

17  given that he was apprised of the fact that he'd been

18  discharged?

19  A.  I do not know that.  I don't have an answer for that.

20          MR. BURNS:  Thank you.  No more questions, Your Honor.

21          THE COURT:  Any follow-up?

22          MR. GAUMER:  Sure.

23                    REDIRECT EXAMINATION

24  BY MR. GAUMER:

25  Q.  Special Agent Reinwart, just to follow up on something the

1  Judge asked, has the victim-witness person with your office been

2  in contact with Jessica the last several weeks or months?

3  A.  Yes.

4  Q.  And what is her reported attitude or feelings towards her

5  brother and this whole matter as it's been investigated or

6  discussed the last couple months?

7  A.  What is Jessica's?

8  Q.  Yes.

9  A.  She still loves him and believes that they'll end up being

10 together.

11         MR. GAUMER:  That's all I have, Your Honor.

12         THE COURT:  Anything else?

13                     RECROSS-EXAMINATION

14 BY MR. BURNS:

15 Q.  And if they're related, again, they could not have a

16 relationship, even if she was of age, correct?

17 A.  Legally, that's my understanding.

18         MR. BURNS:  No more questions.

19         THE COURT:  All right.  Anything else?

20         MR. GAUMER:  No, Your Honor.

21         THE COURT:  Okay.  Thank you.

22                         (Witness excused.)

23         MR. GAUMER:  That's all the evidence the United States

24 has, Judge.

25         THE COURT:  All right.  So anything for the defendant?

1     MR. BURNS:  I'll make a proffer, Your Honor.

2     THE COURT:  All right.  Thank you.

3     MR. BURNS:  I spoke yesterday to Robert Houck,

4  H-o-u-c-k, in Ligonier, Pennsylvania.  He and Linda Houck are

5  the defendant's grandparents and the mother and father of the

6  defendant's mother, Tina Schultheis.  They indicated to me that

7  they would be willing and eager to serve as third-party

8  custodians in this case.  They have no children in their house.

9     After the pretrial services report was prepared, I

10 provided phone numbers to the probation office prior to this

11 hearing so they've got the number of the Houcks.  When I spoke

12 yesterday to the defendant's mother, Tina Schultheis, she was

13 the one that actually recommended the Houcks as third-party

14 custodians.

15     Tina Schultheis, the defendant's mother, indicated

16 that probably she wouldn't be the best place for Mr. Nicely to

17 live because of the fact that she has minor children living at

18 the house.  We'd also looked into the possibility of the

19 defendant's ex-wife, Crystal Nicely, being a third-party

20 custodian, but his minor children live with her, so we're

21 proposing the Houcks in Ligonier, Pennsylvania, as third-party

22 custodians.

23     Tina Schultheis indicated to me that in the area that

24 the Houcks live, she lives very close, I think within a block or

25 two.  Within a 20-minute radius she has a sister, she has two

1   other children, the defendant's siblings, and she has three

2   brothers, I think, in the area as well.  None of these people

3   have criminal histories, none of them have ever been arrested

4   for anything.  They're all supportive of Mr. Nicely and would

5   form a family support system if the defendant was allowed to be

6   released to his grandparents' custody in Ligonier, Pennsylvania.

7           That would be the extent of my proffer.  Obviously,

8   I'd like the opportunity to argue at the appropriate time.

9           THE COURT:  All right.  So argument for the

10  Government.

11          MR. GAUMER:  Your Honor, as I think we're all aware,

12  there's a presumption of detention in this particular case, and

13  I believe that has been bolstered by the testimony that has been

14  presented here today.  The nature and circumstances of the

15  offense, the weight of the evidence, the history and

16  characteristics of the defendant all strongly weigh in the favor

17  of detaining the defendant.

18          Of course, we're to look at two issues, what is the

19  danger that the defendant would be a flight risk and what is the

20  danger the defendant would present to other people in the

21  community.  Oftentimes in cases of this type the concern is if

22  the defendant were released he would pose a danger to other

23  minors out in the community.  It's often rather rare that we

24  discuss flight risk because most defendants that we have in

25  cases like this have stable backgrounds and we have not much

1   evidence that the person is a risk of flight.

2        That is not this case.  What we have in this case is a

3   defendant who has not just been on the Internet enticing someone

4   to have sexual intercourse with him, this is a defendant who has

5   actually and repeatedly had sex not just with a 15-year-old

6   minor, but with a 15-year-old minor who is his sister.

7        He was told by family members -- his release plan is

8   to be released to other family members.  He was told when his

9   family first learned about the illicit relationship between them

10  to stop, he should move to another state, he should stay away

11  from her, and as far as the evidence we heard here today, the

12  last time he was in Pennsylvania, the state which he proposes to

13  go to, he got the idea to come to Iowa, where his sister is

14  currently living, and take her and flee with her to another

15  state and they were gone for four months.

16       I don't believe the release plan the defendant

17  proposes guarantees the safety of his sister, and it certainly

18  doesn't guarantee that he will not flee because he has taken her

19  before from the exact same state where she was living in the

20  exact same place and been gone for four months.

21       As far as employment is concerned, the bond report

22  talks about the defendant's been unemployed for a few years.  To

23  an extent that's slightly -- I'm not going to say inaccurate,

24  but it fails to take into consideration he has actually been

25  employed with the Iowa National Guard so he maybe has not had a

1  daily job but he was employed with the Iowa National Guard.

2          From what we know about that, when the defendant was

3  on the run from his family members with his sister and from law

4  enforcement, he ended up being discharged in March for

5  continuous and willful absence from scheduled training

6  assemblies and activities, so he thought so little of his

7  obligation to the federal government at that point that he ended

8  up being discharged from the military.

9          So not only is he not employed, but the one employment

10  he had he lost as a result of his choice to come to Iowa, take

11  his sister, kidnap her and take her to another state so he can

12  engage in an inappropriate and illegal sexual relationship with

13  her.

14          So not only the presumption of detention, Your Honor,

15  but the evidence in the case shows that the defendant is a

16  danger to his sister, he's a danger to the community, and he's a

17  strong risk of flight because he has, in fact, done so, and

18  based on what's in the complaint, what's in the bond report, the

19  testimony we heard today, we believe that the defendant should

20  be detained pending trial.

21          THE COURT:  Can I just ask a question of either one of

22  you?  The only thing that shows up on the criminal history is a

23  June 2014 sex abuse third charge that was dismissed in August.

24  I assume --

25          MR. BURNS:  That's this case, Your Honor.

1          THE COURT:  That's this case?

2          MR. GAUMER:  Yes, Judge.

3          THE COURT:  That came over into federal court, it's

4   not a separate event?

5          MR. BURNS:  No.  It's this case.  It was dismissed on

6   Monday, the day the defendant was brought in.

7          THE COURT:  Okay.  All right.  So argument for

8   defendant?

9          MR. BURNS:  Your Honor, on every scale except the

10  nature and circumstances of the offense, this defendant would be

11  a prime risk for release on conditions.  He's got virtually no

12  criminal history.  He's 26 years old.  Essentially, he had his

13  first drink on his 21st birthday and that was his last drink as

14  well.  He's never done anything like that.

15         He's got a GED.  He has worked consistently right

16  up -- the Government said until several years ago.  Actually,

17  according to the presentence report, it was up until November

18  2013, which is when, according to the allegations in the

19  complaint, that's when he had the run-in with the father and

20  that's where this all began.  My guess is that's when he began

21  being absent at the National Guard as well.  So up until this

22  happened, Defendant was able to maintain employment and that's

23  not a question.

24         I think basically the concern, I think, that the Court

25  would have would be the nature and circumstances of the offense.

1   Obviously, as the Government points out, this occurred while the

2   defendant was living in Pennsylvania and we're proposing that

3   the defendant live with his grandparents in Pennsylvania.  The

4   difference now, of course, is that he would be on electronic

5   monitoring, that he would be subject to restrictions on use of

6   computer and other communication devices, so he'd be monitored

7   by the Government, he'd be monitored by the probation office.

8          Difference also is that now this has been discovered

9   by the Government, he knows he's under -- he knows the danger

10  he's in, he knows the seriousness of the charge against him,

11  something that wasn't -- it wasn't in place in November of 2013.

12         He'd be in Pennsylvania.  The stepsister would be here

13  in Iowa.  That's at least a day's drive from here, and, again,

14  he'd be on GPS monitoring, so I think that's actually an Adam

15  Walsh condition and there would be no way around that.  He'd be

16  on a curfew.  There really wouldn't be any way for him to

17  violate.

18         I think clearly there are circumstances that guarantee

19  that he would not be a flight risk and he wouldn't really be a

20  risk to the community as well.  Again, assuming, assuming, for

21  the sake of argument, that the allegations are correct, what we

22  have here is a situation where the defendant formed an emotional

23  and physical relationship with a person with whom he just can't

24  have one.  He can't be physically involved with his sister and

25  he can't be involved with a 15-year-old at his age.

1          But there's no indication that he's ever shown any

2    interest in anybody but her.  There's no indication that he's

3    engaged in a pattern of activity.  So I don't think anybody

4    else -- there's any argument that anybody else is at risk.  And,

5    again, I think that there are conditions that could be put in

6    place that would guarantee no contact between him and his

7    sister.

8          THE COURT:  All right.  Based upon the Pretrial

9    Services Report and the information received both by evidence

10   and by proffer, first, I do make the probable cause finding for

11   purposes of a preliminary exam that there is probable cause to

12   believe that the offense charged, which is by using interstate

13   commerce persuading or enticing or inducing a minor to engage in

14   a sexual activity, and so the charge, there's probable cause and

15   we'll go ahead and hold the defendant to answer on that.

16         What that means, Mr. Nicely, is the case will get

17   presented to the grand jury.  I'm not sure when they meet this

18   month.  If they return an indictment, then you would come back

19   here.  That's a more formal charge, and then that would be

20   presented to you and we'd set a trial date and some pretrial

21   deadlines.

22         As far as the issue of detention or release, I have

23   specifically considered first the mom and then grandparents as

24   third-party custodians and placement in a residential correction

25   facility, just assuming I had one, and I don't think that we

1  have beds available, but assuming I did, I factored that in.

2          Even with GPS and Adam Walsh conditions, I find that

3  those are not adequate conditions of release.  I find that there

4  is clear and convincing evidence that there is no combination of

5  conditions that would assure the safety of others in the

6  community, and I certainly find by a preponderance of the

7  evidence that there are no combination of conditions that assure

8  his appearance.

9          That's based on his history of flight, his history of

10  continuing this relationship, the fact the victim is back here

11  and still somehow believes she's in this relationship.  So

12  there's really not enough safeguards that protect her and, I

13  think, others in the community should he finally decide this

14  relationship isn't going to pan out.

15          So based on his actions, particularly in the last six

16  months, the lack of real strong community ties to any particular

17  community, I don't find that the family members in Pennsylvania

18  are sufficient social support to continue to protect him and

19  from, again, being in this loop where he thinks there's this

20  relationship and it's possible to continue it online or by video

21  or through other methods of communication.  So I don't think

22  just telling somebody to stop doing that is effective, it hasn't

23  worked so far, and so I'm going to enter an order of detention.

24          You certainly have the right to appeal this order.

25  You should do that within 14 days.  We'll provide a copy of the

1  transcript on appeal if that's what you'd like.

2           Is there anything else we need to do?

3           MR. GAUMER:  No, Your Honor.

4           MR. BURNS:  Not at this point, Your Honor.

5           THE COURT:  All right.  Thank you.

6           (Proceedings concluded at 11:40 a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        C E R T I F I C A T E

2              I, Kelli M. Mulcahy, a Certified Shorthand Reporter of

3    the State of Iowa and Federal Official Realtime Court Reporter

4    in and for the United States District Court for the Southern

5    District of Iowa, do hereby certify, pursuant to Title 28,

6    United States Code, Section 753, that the foregoing is a true

7    and correct transcript of the stenographically reported

8    proceedings held in the above-entitled matter and that the

9    transcript page format is in conformance with the regulations of

10   the Judicial Conference of the United States.

11             Dated at Des Moines, Iowa, this 28th day of August,

12   2014.

13

14

15                        /s/ Kelli M. Mulcahy
                          Kelli M. Mulcahy, CSR No. 941, RMR, CRR
16                        Federal Official Court Reporter

17

18

19

20

21

22

23

24

25